# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 16-759V
Filed: May 14, 2020

```
* * * * * * * * * * * * * *
JESSICA BARRETT,                *      To Be Published
                                *
           Petitioner,          *
v.                              *      Decision on Attorneys' Fees and Costs;
                                *      Reasonable Basis; Denial
SECRETARY OF HEALTH             *
AND HUMAN SERVICES,             *
                                *
           Respondent.          *
* * * * * * * * * * * * * *
```

*Paul Brazil, Esq.*, Muller Brazil, LLP, Dresher, PA, for petitioner.
*Heather Pearlman, Esq.*, U.S. Department of Justice, Washington, DC, for respondent.

### DECISION ON ATTORNEYS' FEES AND COSTS[1]

**Roth**, Special Master:

On June 28, 2016, Jessica Barrett ("Ms. Barrett," or "petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program.[2] Petitioner alleges that she developed a right shoulder injury after receiving an influenza ("flu") vaccination on September 30, 2013. Petition ("Pet."), ECF No. 1. Petitioner now seeks an award of attorneys' fees and costs.

## I. Background

### A.    Summary of Relevant Medical Records

---

[1] This Decision has been formally designated "to be published," which means it will be posted on the Court of Federal Claims's website, in accordance with the E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, 2913 (codified as amended at 44 U.S.C. § 3501 note (2006)). **This means the Decision will be available to anyone with access to the internet.** However, the parties may object to the Decision's inclusion of certain kinds of confidential information. Specifically, under Vaccine Rule 18(b), each party has fourteen days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the whole Decision will be available to the public. *Id.*

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

**a.  Petitioner's Medical History Prior to the Allegedly Causal Flu Vaccine**

Petitioner's medical history prior to receipt of the allegedly causal flu vaccine includes longstanding neck, right wrist, and back issues. On August 11, 2011, she presented to her primary care physician, Dr. Jacobs, complaining of a muscle spasm on the right side of her neck. Pet. Ex. 2 at 27. Petitioner was diagnosed with moderate right trapezius[3] spasm with tenderness and right paracervical spasm; she was prescribed tizanidine,[4] diazepam,[5] and physical therapy three times per week for four weeks. *Id*. Petitioner returned a month later, on September 12, 2011, because the spasm had not gone away. *Id*. at 34. She reported that physical therapy did not help, and she could not tolerate tizanidine. *Id*. She was diagnosed with right medial focal trapezius spasm with moderate tenderness and was referred for right trigger point injections. *Id*. An x-ray of her cervical spine showed moderate disc degeneration at C5-6 and straightening of normal cervical lordosis consistent with muscle spasm. *Id*. at 39. She returned again on October 11, 2011, still complaining of neck pain. *Id*. at 44. On exam, she had right paracervical spasm with tenderness, right trapezius tenderness, right sciatic notch tenderness, and a limited range of motion when she turned her head to the left. *Id*. She was diagnosed with cervicalgia[6] and sciatica,[7] both on the right side. *Id*. An MRI of the spine was ordered. *Id*. An MRI of the lumbar spine showed moderate sized posterior central disc extrusion at L5-S1. *Id*. at 49. An MRI of the thoracic spine was normal. *Id*. at 50. Petitioner returned on November 29, 2011, complaining that the left side of her neck was sore and stiff following a car accident. *Id*. at 53. On exam, she had tenderness on the left side of her neck, paracervical spasm, a limited range of motion on the left side of her neck, and left trapezius spasm. *Id*. She was diagnosed with cervicalgia and was prescribed prednisone and Flexeril.[8]

On August 29, 2012, petitioner presented to Dr. Jacobs for pain in the extensor tendon of her right thumb which radiated up her forearm, numbness and tingling in her fingers, and wrist pain; she was diagnosed with right tenosynovitis of the thumb. Pet. Ex. 2 at 59. Petitioner was advised to wear a thumb splint for 10 days, take ibuprofen, and avoid repetitive movements with her thumb. *Id*.

---

[3] The trapezius muscle reaches from the seventh cervical vertebra to the clavicle and shoulder joint. It is used in raising the shoulder. *Musculus trapezius*, DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1212 (32d ed. 2012) [hereinafter "DORLAND'S"].

[4] Tizanidine is a short-acting drug used to manage muscle spasms. *Tizanidine hydrochloride*, DORLAND'S at 1932.

[5] Diazepam is a benzodiazepine primarily used as an anti-anxiety agent; it is also used as a skeletal muscle relaxant. *Diazepam*, DORLAND'S at 512.

[6] Cervicalgia is neck pain. "Cervical" means pertaining to the neck. *Cervical*, DORLAND'S at 333. "-algia" is a word termination denoting a painful condition. *-algia*, DORLAND'S at 48.

[7] Sciatica is a syndrome characterized by pain radiating from the back into the buttock. *Sciatica*, DORLAND'S at 1678.

[8] Flexeril is the brand name for cyclobenzaprine hydrochloride, a drug used as a skeletal muscle relaxant for relief of painful muscle spasms. *Flexeril*, DORLAND'S at 717; *cyclobenzaprine hydrochloride*, DORLAND'S at 455.

On February 20, 2013, petitioner presented to Dr. Battista at Orthopedic Associates of Allentown ("OAA") for tenosynovitis of the right hand and wrist. Pet. Ex. 4 at 40-41. She was administered betamethasone[9] and lidocaine[10] injections. *Id.* at 63.

Petitioner returned to Dr. Battista on August 23, 2013, for follow-up of radial styloid tenosynovitis[11] in her right wrist. Pet. Ex. 4 at 39, 62. She was prescribed methylprednisolone. *Id.* at 62.

### b. Petitioner's Medical History At the Time of and After Receipt of the Allegedly Causal Flu Vaccine

On September 30, 2013, petitioner received the allegedly causal flu vaccine, at her place of employment, the office of Hazleton School District. Pet. Ex. 1 at 1; Pet. Ex. 8 at 1-2; Fact Ruling at 2. In support of her petition, petitioner submitted an Affidavit in which she affirmed "within hours" of her vaccination, her "right arm and shoulder became very painful." Pet. Ex. 1 at 1. "The pain progressed over the following weeks" before she presented for medical care on November 29, 2013. *Id.*

The medical records reveal a medical visit with petitioner's orthopedic, Dr. Battista, on November 1, 2013, for follow-up of her right radial styloid tenosynovitis. Pet. Ex. 4 at 96. Petitioner reported little change in her symptoms since her last visit; the splint was helpful for nighttime, but she had trouble wearing it during the day. *Id.* She reported weakness, swelling, and stiffness in her right wrist, as well as dry eyes and sinus pressure. *Id.* at 97, 98. Upon exam, she had tenderness of the radial styloid and swelling of the first dorsal extensor sheath. *Id.* at 99. She received lidocaine and betamethasone injections in her right wrist and was instructed to follow-up in two months. *Id.* at 68, 99. Petitioner made no complaints to Dr. Battista of right shoulder or arm pain at this visit or during his examination of her right wrist, arm and shoulder.

On November 13, 2013, petitioner was discharged from physical therapy for her right wrist because she was unable to get time off from work to attend therapy. Pet. Ex. 4 at 46. There was no complaint of right shoulder pain contained in the physical therapy records between September and November.

---

[9] Betamethasone is a steroid used as an anti-inflammatory and immunosuppressant. *Betamethasone*, DORLAND'S at 211.

[10] Lidocaine is a local anesthetic applied topically to the skin or via infiltration injection. *Lidocaine*, DORLAND'S at 1034.

[11] Radial styloid tenosynovitis is inflammation of a tendon sheath near the radius, one of the bones of the forearm. *Radial*, DORLAND'S at 1570; *radius*, DORLAND'S at 1574; *tenosynovitis*, DORLAND'S at 1882. Radial styloid tenosynovitis is also known as de Quervain disease, an "overuse injury with painful tenosynovitis due to relative narrowness of the common tendon sheath" of muscles in the thumb. *De Quervain disease*, DORLAND'S at 532; *musculus abductor pollicis longus*, DORLAND'S at 1203; *musculus extensor pollicis brevis*, DORLAND'S at 1204.

On November 29, 2013, petitioner presented to Dr. Jacobs complaining of a scab in her right nostril for the past six months and tendonitis[12] in her right wrist. Pet. Ex. 2 at 66. Upon examination, she had marked tenderness over her right trapezius and could not "abduct past 90 degrees w/o severe pain." *Id*. at 67. Her left side was "not as bad." *Id*. The assessment was bilateral shoulder tendinitis. *Id*. at 67-68. MRI without contrast of both shoulders was ordered. *Id*. at. 68. She was prescribed prednisone. *Id*. at 70. Petitioner made no mention of the flu vaccine when reporting bilateral shoulder pain to Dr. Jacobs.

MRIs of the left and right shoulders performed on December 12, 2013, revealed "Tendinosis of the rotator cuff tendons" in both shoulders. Pet. Ex. 2 at 92; Pet. Ex. 4 at 74. Petitioner had mild acromioclavicular degeneration of her right shoulder. Pet. Ex. 3 at 1; Pet. Ex. 4 at 75.

Petitioner next presented to Dr. Jacobs on January 14, 2014, complaining of right shoulder pain. Pet. Ex. 2 at 101. Her exam was normal. *Id*. at 102. Petitioner was diagnosed with insomnia, for which she was prescribed zolpidem tartrate;[13] allergic rhinitis, for which she was prescribed cetirizine;[14] and tendinitis of the right rotator cuff, for which no treatment was rendered. *Id*. at 107. Petitioner was instructed to return in six months. *Id*. at 105.

Two days later, on January 21, 2014, petitioner presented to Dr. Hawkins at OAA, complaining of right shoulder pain. Pet. Ex. 4 at 92. Petitioner reported she began having right lateral arm pain about a month after receiving a flu shot. *Id*. The pain was especially bad at night and she did not have relief with Ambien. *Id*. She denied numbness or neck pain. *Id*. Upon examination, she had tenderness of the rotator cuff and was positive for lateral impingement, Hawkins test and Neer test. *Id*. at 95. An MRI showed an intact rotator cuff without glenohumeral effusion and "very mild" subacromial bursitis. *Id*. The assessment was right shoulder pain with impingement[15] and possible rotator cuff tendonitis.[16] *Id*. She was administered lidocaine and Depo-Medrol[17] injections in her right shoulder and referred to physical therapy for right shoulder impingement. *Id*. at 32, 67, 95.

---

[12] Tendinitis is inflammation of tendons and of tendon-muscle attachments. *Tendinitis*, DORLAND'S at 1881.

[13] Zolpidem tartrate is a non-benzodiazepine sedative-hypnotic administered orally in the short-term treatment of insomnia. *Zolpidem tartrate*, DORLAND'S at 2092.

[14] Cetirizine hydrochloride is a non-sedating antihistamine used in the treatment of allergic rhinitis. *Cetirizine hydrochloride*, DORLAND'S at 334.

[15] Impingement syndrome is a type of overuse injury with progressive pathologic changes resulting from mechanical impingement by a ligament or joint against the rotator cuff. *Impingement syndrome*, DORLAND'S at 1834.

[16] Rotator cuff tendinitis, is an overuse injury consistent of inflammation of tendons of one or more of the muscles forming the rotator cuff, usually owning to repetitive elevation and abduction of the upper limb. *Tendinitis*, DORLAND'S at 1881.

[17] Depo-Medrol is the brand name for methylprednisolone acetate, a steroid administered topically or by injection as an anti-inflammatory and immunosuppressant. *Depo-Medrol*, DORLAND'S at 492;

On January 23, 2014, petitioner presented to Dr. Plaza for an initial physical therapy evaluation. Pet. Ex. 5 at 4. She reported an onset of right shoulder pain around mid-October of 2013, or two weeks after a flu shot. *Id.* The pain was waking her up at night and she was having occasional paresthesias in her right hand. *Id.* Upon exam, she was positive on the Hawkins-Kennedy test, the Neer test, and the "empty can" test. *Id.* She had a negative Yergason's test. *Id.* She had moderate tenderness around the anterior shoulder/lateral deltoid area. *Id.* at 5. It was noted that petitioner tolerated treatment well and had some relief. *Id.* She would benefit from physical therapy to decrease her right shoulder pain with functional activity and return to her pre-injury level of function. *Id.* Dr. Plaza recommended physical therapy three times per week for four weeks, for a total of twelve visits. *Id.* at 6.

Petitioner presented to physical therapy on February 10, 2014 and February 24, 2014. Pet. Ex. 5 at 7-10.

On April 25, 2014, petitioner returned to Dr. Hawkins complaining of a right shoulder problem. Pet. Ex. 4 at 90. She had received a right subacromial injection in January and started physical therapy with notable improvement; her shoulder issues had not resolved but were "much better." *Id.* She had some pain but was functional for all work and "ADLs." *Id.* Upon examination, she did not have tenderness at the acromioclavicular joint, but had mild pain with active abduction. *Id.* at 91. The assessment was mild persistent right shoulder pain with a history of mild bursitis by MRI. *Id.* at 92. Her symptoms did not warrant operative intervention; she was instructed to follow-up as needed. *Id.* That day, she also received lidocaine and betamethasone injections in her right wrist. *Id.* at 66, 89.[18]

Three months later, on July 11, 2014, petitioner presented to Dr. Culp at Philadelphia Hand to Shoulder Center, complaining of right wrist pain for longer than a year, despite having a normal MRI. Pet. Ex. 10 at 12. Upon exam, she was noted to have "full range of motion of the shoulders without tenderness." *Id.* She was diagnosed with "right intersection syndrome" and was determined to be a candidate for surgical release of the right wrist. *Id.* at 13. Petitioner did not complain of right shoulder pain at this visit.

On October 24, 2014, petitioner underwent right intersection release on her right wrist, a surgical procedure performed under anesthesia. Pet. Ex. 10 at 17-18. Petitioner returned to Dr. Culp for subsequent follow-up visits on November 7 and December 12, 2014. *Id.* at 10-11.

Petitioner's next visit to any medical professional with right shoulder pain was on February 27, 2015, when she presented to Dr. Hawkins. Pet. Ex. 4 at 85. She reported muscle aches, muscle weakness, and arthralgias and joint pain. *Id.* at 87. She had tenderness of the right rotator cuff but full range of motion. *Id.* at 88. An MRI showed no fracture or dislocation with well-preserved joint spaces and normal alignment. *Id.* The assessment was mild recurrent right shoulder pain with a history of mild subacromial bursitis. *Id.* She was administered lidocaine and Depo-Medrol

---

*methylprednisolone*, DORLAND'S at 1154.

[18] No records were filed indicating that petitioner presented for any further physical therapy for her right shoulder other than the two visits in February of 2014.

injections. *Id*. at 65, 88. She was encouraged to continue with home exercises and stretches. *Id*. at 89.

Two years later, on April 13, 2017, petitioner was again referred to Dr. Culp, who she presented to on April 13, 2017 with a chief complaint of right elbow pain. Pet. Ex. 10 at 8. Petitioner reported that, in February of 2016, she hit her elbow on the corner of an island at home, resulting in severe pain. *Id*. Another doctor had diagnosed her with medial epicondylitis;[19] home physical therapy was recommended. *Id*. She was taking Triamterene, a diuretic, and Restasis for dry eyes. *Id*. Upon exam, she had "full range of motion of both shoulders without tenderness" and tenderness over the medial epicondyle. *Id*. at 9. The impression was right medial epicondylitis[20] and right medial collateral ligament rupture of the right elbow. *Id*. Dr. Culp recommended another MRI. *Id*.

An MRI of petitioner's right elbow performed on October 10, 2016, showed a cyst on her elbow. The differential diagnosis included synovial cyst or ganglion cyst. Pet. Ex. 10 at 23.

Petitioner returned to Dr. Culp on April 18, 2017, for right medial elbow pain. Pet. Ex. 10 at 7. Dr. Culp noted that petitioner's MRI was consistent with medial epicondylitis. *Id*. Several treatment options were discussed, including bracing, therapy, injections, and surgery. *Id*. Petitioner requested a platelet rich plasma ("PRP") injection. *Id*.

The remainder of the medical records filed were for treatment of petitioner's elbow and are not relevant to her alleged shoulder injury.

## B. Procedural History

On June 28, 2016, petitioner filed her petition along with her affidavit, medical records, an exhibit list, and a Statement of Completion. *See* Pet., Petitioner's Exhibits ("Pet. Ex.") 1-5, ECF Nos. 1, 3, 5. Petitioner did not file proof of vaccination.

This matter was initially assigned to the Special Processing Unit ("SPU"). ECF Nos. 6-7.

On June 29, 2016, petitioner filed a Motion for Authority to Issue a Subpoena to the Hazleton Area School District for any records pertaining to petitioner, including her medical, vaccination, and employment records from September 1, 2010 to present. *Id*. at 1-2, ECF No. 9. This motion was granted. *See* Order, ECF No. 10.

The initial status conference was held on August 3, 2016. Petitioner's counsel acknowledged that proof of vaccination needed to be obtained and reported that a subpoena had

---

[19] No records of this medical visit or treatment were filed. It appears that not all of petitioner's medical records were filed in this matter.

[20] Medial epicondylitis is an overuse injury with pain around the medial epicondyle of the humerus where the flexor muscles of the arm and hand attach, popularly called "golfer's elbow." *Epicondylitis*, DORLAND'S at 630.

been served on the Hazleton Area School District ("HASD"), where petitioner is employed in the Human Resources Department. Scheduling Order at 1, ECF No. 12. Petitioner was ordered to file outstanding vaccine records from HASD and an amended statement of completion. *Id.* Respondent was ordered to file a status report advising of his position within 30 days of petitioner filing an amended statement of completion. *Id.* at 1-2.

On September 2, 2016, petitioner filed HASD's response to the subpoena as Pet. Ex. 6. ECF No. 14. Petitioner also filed a status report ("Pet. S.R.") advising that the subpoena response did not contain petitioner's vaccination record. Pet. S.R. at 1, ECF No. 15. Petitioner requested an additional 45 days "to investigate whether fact witnesses could testify regarding vaccine administration." *Id.* Petitioner was ordered to file medical records or additional evidence by October 17, 2016. *See* Order, ECF No. 16.

On October 17, 2016, petitioner filed a status report ("Pet. S.R.") requesting a status conference to discuss documentation of petitioner's vaccination. Pet. S.R. at 1, ECF No. 17. A status conference was held on October 28, 2016, during which petitioner's counsel advised that petitioner's personnel file did not contain a record of the allegedly causal vaccination. Scheduling Order at 1, ECF No. 18. Additionally, the nurse who administered the vaccination had retired and could not be contacted. *Id.* Petitioner's counsel made an oral motion for a subpoena. *Id.* Petitioner was ordered to file any additional evidence by November 30, 2016. *Id.* An order was issued granting petitioner's oral motion for a subpoena. ECF No. 19.

On November 30, 2016, petitioner filed a status report ("Pet. S.R.") advising that she had been unable to obtain any additional documentation of her receipt of the flu vaccination. Pet. S.R. at 1, ECF No. 20. Petitioner proposed filing a status report in 45 days advising "whether additional evidence regarding vaccine administration was available, and if not proposing steps to advance the litigation." *Id.*

A status conference was held on December 20, 2016 to discuss "petitioner's difficulties with obtaining proof of vaccination." Scheduling Order at 1, ECF No. 21. Due to the lack of cooperation from HASD regarding document production, the Court recommended "seeking deposition testimony from relevant personnel." *Id.* Petitioner was ordered to file motions for subpoenas for deposition and production of relevant documents for specific HASD personnel by January 31, 2017. *Id.*

On January 31, 2017, petitioner filed her vaccine administration consent form as Pet. Ex. 7 along with a status report requesting a status conference to discuss further proceedings. ECF Nos. 22-23.

A status conference was held on February 14, 2017, to discuss the vaccine administration consent form filed as Pet. Ex. 7. Scheduling Order at 1, ECF No. 24. During the conference, petitioner's counsel advised that this form was located by petitioner and not provided by HASD. *Id.* Respondent's counsel advised that respondent did not believe this form was sufficient proof of vaccination. *Id.* Counsel for both parties advised the Court of "the myriad attempts and avenues …investigated to obtain proof of petitioner's vaccination." *Id.* Counsel further advised that HASD had not been cooperative in providing proof of vaccination. *Id.* Petitioner was ordered to submit

an affidavit authenticating the consent form and including, among other items, "an explanation setting forth the date and circumstances regarding how the Consent Form was located." *Id.* at 1-2. Petitioner's counsel was ordered to submit an affidavit setting forth the date the subpoena was served on HASD, describing HASD's response to the subpoena, and confirming that no documents were produced in response to the subpoena. *Id.* at 2. The parties were ordered to file "a joint status report stating that all relevant evidence has been submitted…and stating whether the parties desire a fact ruling." *Id.*

On February 23, 2017, petitioner filed an affidavit stating that she works in the Human Resources Department for HASD, which offers the flu shot to all employees. Pet. Ex. 8 at 1, ECF No. 26. Petitioner affirmed that every year, an email is sent to employees indicating which dates the flu shot will be available. *Id.* In 2013, the flu shot administration date was September 27, with September 30 as a "make-up" day. *Id.* Petitioner affirmed that, on September 30, 2013, she waited in line with 15 to 20 other employees but did not recall the names of those employees. *Id.* at 2. Petitioner affirmed that, while waiting in line, she completed and signed a consent form; she then went to the office next door and made a copy. *Id.* Petitioner affirmed that it is her "general practice" to copy forms she is asked to sign. *Id.* When she received the flu shot, she turned in her consent form to the nurse who administered the shot but kept her copy of the form with her tax documents. *Id.* Petitioner was unable to produce any documentation of her flu vaccination other than the consent form.[21]

On March 16, 2017, petitioner filed an affidavit from counsel stating that counsel served a subpoena on HASD on July 18, 2016. In response, HASD produced several documents but failed to produce any documentation related to petitioner's 2013 vaccine. Pet. Ex. 9 at 1-2, ECF No. 27. Despite petitioner's representation that the school nurse was provided with, and retained, the original consent form, it too was apparently not included in HASD's response to the subpoena. Petitioner also filed a joint status report ("J.S.R.") requesting that the Court issue a fact ruling regarding vaccine administration, specifically "whether Petitioner received an influenza vaccination in her right shoulder on September 30, 2013." J.S.R. at 1, ECF. No. 28.

On June 2, 2017, without a hearing, a Fact Ruling was issued finding, by a preponderance of the evidence, that petitioner received a flu shot on September 30, 2013, in her right shoulder for the reasons set forth therein by the Chief Special Master. Fact Ruling at 2, ECF No. 29.

Respondent filed a status report on July 3, 2017, requesting that petitioner file "any prior medical records pertaining to petitioner's orthopedic, neurology, and/or any musculoskeletal or physical therapy history." Respondent's Status Report ("Resp. S.R.") at 1, ECF No. 30. Petitioner was ordered to file these records and a status report by August 2, 2017. Scheduling Order at 1, ECF No. 31. Petitioner filed a status report on August 2, 2017, advising that the records requested by respondent did not exist and that petitioner had submitted a settlement demand to respondent. Pet. S.R. at 1, ECF No. 32. Respondent was ordered to file a status report by September 5, 2017, advising whether he was willing to engage in settlement discussions. Scheduling Order at 1, ECF No. 33.

---

[21] Petitioner provided no explanation for how she remembered these details, upon what she relied for these details, or how, if this was a yearly event, she could recall these details as occurring in 2013 rather than another year.

Respondent filed a status report on September 5, 2017, advising that he was not amenable to settlement and requested a deadline to file his Rule 4(c) Report. Resp. S.R. at 1, ECF No. 34. Respondent was ordered to file his Rule 4(c) Report by November 6, 2017. Non-PDF Order, dated Sept. 6, 2017.

Respondent filed his Rule 4(c) Report on November 6, 2017, recommending against compensation. Resp. Report, ECF No. 35. Respondent submitted that petitioner's alleged injury did not meet the criteria for an on-Table SIRVA claim. *Id*. at 5. Respondent further submitted that petitioner did not complain of shoulder pain during a visit with her orthopedist on November 1, 2013, one month after receiving the flu shot, and in fact did not complain of shoulder pain until two months after receiving the flu shot. *Id*. at 6.

This matter was reassigned to me on November 28, 2017. ECF Nos. 36-37.

A status conference was held on January 17, 2018. Following a discussion of petitioner's medical history, I noted that petitioner's personnel records stated that she had right wrist surgery in September of 2014, but records reflecting this had not been filed. Scheduling Order at 1-2, ECF No. 38. Petitioner was ordered to file any and all records relating to her right wrist surgery by March 19, 2018. *Id*. at 2.

Petitioner filed an unopposed Motion for Extension of Time until April 18, 2018, to file her medical records. ECF No. 39. This motion was granted, and the deadline was extended to April 23, 2018. Non-PDF Order, dated Mar. 19, 2018.

Petitioner filed additional medical records on April 20, 2018. Pet. Ex. 10, ECF No. 40. Petitioner filed a Statement of Completion on April 24, 2018. ECF No. 41.

During a status conference held on June 5, 2018, I pointed out that the medical records filed did not support a sudden onset of shoulder pain as stated in petitioner's affidavit and the Petition, but rather an onset of shoulder pain two months after her flu vaccine. Scheduling Order at 1, ECF No. 42. Additionally, it was noted that the medical records did not support that petitioner suffered from her alleged injury for more than six months. *Id*. Petitioner's counsel requested the opportunity to file an expert report; I noted that, because there was a dispute as to onset, it was not yet appropriate to obtain an expert because the issue of onset needed to be addressed first. *Id*. at 2. Petitioner's counsel did not request an onset hearing to address the onset issue. I suggested that petitioner's counsel reach out to petitioner's treating physician to see if he recalled any information beyond what was contained in the medical records. *Id*. Petitioner was ordered to file a status report advising how she intended to remedy the inconsistencies between her affidavit and the medical records, and, if possible, an affidavit from her treating physician by August 6, 2018. *Id*.

Petitioner filed a status report on August 6, 2018, advising that "Petitioner and petitioner's counsel have been unable to engage in any communication with Dr. Jacobs and it is increasingly unlikely any communication will occur." Pet. S.R. at 1, ECF No. 43. Petitioner requested an additional 14 days to determine how she intended to proceed. *Id*. Petitioner was ordered to file a status report by August 21, 2018, indicating how she would like to proceed. Non-PDF Order, dated Aug. 7, 2018.

Petitioner filed a status report on August 21, 2018, advising that she was "still considering her options" and requesting an additional 14 days to determine how she intended to proceed. Pet. S.R. at 1, ECF No. 44. Petitioner's deadline to file a status report advising how she intended to proceed was extended to September 4, 2018. Non-PDF Order, dated Aug. 21, 2018.

On September 4, 2018, petitioner filed a motion for a ruling on the record. Motion, ECF No. 45. Respondent filed his response on September 17, 2018, submitting that petitioner had not proven by preponderant evidence that her symptoms began within 48 hours of vaccination, and that petitioner had not satisfied the six-month severity requirement. Response at 6-7, ECF No. 46. Petitioner did not file a reply.

Because onset and the six-month severity requirement were at issue, petitioner's motion was treated as a motion for a fact ruling determining the onset of petitioner's alleged injury and whether petitioner has met the six-month severity requirement.

A ruling was issued on June 19, 2019 determining that petitioner's right shoulder pain began on or about November 29, 2013, and that petitioner had satisfied the six-month severity requirement. Decision, ECF No. 48. Petitioner was given 90 days to file either an expert report based on my onset ruling or a status report indicating how she intended to proceed. *Id.* at 12.

Petitioner filed a motion to dismiss her claim on October 1, 2019. Petitioner's claim was accordingly dismissed on the same day. Decision, ECF No. 54.

On November 22, 2019, petitioner filed the instant application for attorneys' fees and costs, along with supporting documentation, requesting $12,389.70 in attorneys' fees and $428.71 in costs, for a total of $12,818.41. Motion, ECF No. 59. Respondent filed a response on January 2, 2020, in which he "defer[ed] to the Special Master as to whether the statutory requirements for a discretionary award of attorneys' fees and costs have been met." Response, ECF No. 61. Petitioner did not file a reply.

This matter is now ripe for determination.

## II. Applicable Law and Analysis

The Vaccine Act permits an award of "reasonable attorneys' fees" and "other costs." § 15(e)(1). If a petitioner succeeds on the merits of his or her claim, petitioner's counsel is entitled to a reasonable attorneys' fee award. *Id.*; *see Sebelius v. Cloer*, 133 S. Ct. 1886, 1891 (2013). However, a petitioner need not prevail on entitlement to receive a fee award so long as the petition was brought in "good faith" supported by "reasonable basis." § 15(e)(1).

Inquiry into whether counsel brought a claim in good faith is a subjective inquiry that questions whether the attorney exercised adept professional judgment in determining whether a petitioner may be entitled to compensation. *Chuisano v. United States*, 116 Fed. Cl. 276, 286 (2014) (citations omitted). Here, respondent did not question petitioner's counsel's subjective good faith in bringing the claim. Therefore, petitioner's good faith requires no further analysis.

Reasonable basis is an objective standard determined by evaluating the sufficiency of the medical records in petitioner's possession at the time the claim is filed. "Special masters have historically been quite generous in finding reasonable basis for petitions." *Turpin v. Sec'y of Health & Human Servs.*, No. 99-564, 2005 WL 1026714 at *2 (Fed. Cl. Spec. Mstr. Feb. 10, 2005). However, the Federal Circuit recently denied an award of attorney's fees based on petitioner's lack of reasonable basis in *Simmons v. Secretary of Health and Human Services.* 875 F.3d 632, 636 (Fed. Cir. 2017). In *Simmons*, the Federal Circuit determined that petitioner lacked reasonable basis for filing a claim when, at the time of filing: (1) petitioner's counsel failed to file proof of vaccination, (2) there was no evidence of a diagnosis or persistent injury allegedly related to a vaccine in petitioner's medical records, and (3) the petitioner had disappeared for approximately two years prior to the filing of the petition and only resurfaced shortly before the statute of limitations deadline on his claim expired. *See id.* at 634-35. The Federal Circuit specifically stated that the reasonable basis inquiry is objective and unrelated to counsel's conduct prior to filing a claim. The Court consequently affirmed the lower court's holding that petitioner's counsel lacked reasonable basis in filing this claim based on the insufficiency of petitioner's medical records and proof of vaccination at the time the petition was filed. *Id.* at 636.

In light of *Simmons*, the Court of Federal Claims determined, "[I]n deciding reasonable basis[,] the Special Master needs to focus on the requirements for the petition under the Vaccine Act to determine if the elements have been asserted with sufficient evidence to make a feasible claim for recovery. . . Under the objective standard articulated in *Simmons*, the Special Master should have limited her review to the claim alleged in the petition to determine if it was feasible based on the materials submitted." *Santacroce v. Sec'y of Health & Human Servs.*, No. 15-555V, 2018 WL 405121 at *7 (Fed. Cl. 2018). When evaluating a case's reasonable basis, petitioner's "burden [in demonstrating reasonable basis] has been satisfied . . . where a petitioner has submitted a sworn statement, medical records, and [a] VAERS report which show that recovery is feasible." *Id.* Moreover, the special master may consider various objective factors including "the factual basis of the claim, the novelty of the vaccine, and the novelty of the theory of causation." *Amankwaa v. Sec'y of Health & Human Servs.*, 138 Fed. Cl. 282, 289 (2018).

In order to determine whether there was a reasonable basis for this claim, some analysis of the claim itself is required. As a preliminary matter, there was a conflict between the onset of shoulder pain as documented in the medical records and the onset of shoulder pain as represented by petitioner in her affidavit. The medical records filed in this matter indicate that petitioner's first documented complaint of shoulder pain was on November 29, 2013, approximately two months after receiving the allegedly causal flu vaccine. At that time, petitioner complained of pain in both shoulders; she did not relate her pain to the vaccination. During this two-month time period, petitioner saw Dr. Battista, her orthopedist, for treatment of right wrist pain; she made no complaints during this appointment of right shoulder or upper arm pain. In contrast, petitioner affirmed that she experienced pain in her right arm and shoulder within hours of vaccination, which progressed over the following weeks before she sought medical care. This history was not given to any of petitioner's treaters; at subsequent appointments on January 21 and January 23, 2014, petitioner reported that her pain began about a month after her flu shot and about two weeks after her flu shot, respectively.

Contemporaneous medical records are presumed to be accurate and complete. *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). Additionally, contemporaneous medical records may be considered more persuasive than a petitioner's affidavit created years after the fact. *See Gerami v. Sec'y of Health & Human Servs.*, No. 12-442V, 2013 WL 5998109, at *4 (Fed. Cl. Spec. Mstr. Oct. 11, 2013) (finding that contemporaneously documented medical evidence was more persuasive than the letter prepared for litigation purposes), *mot. for rev. denied*, 127 Fed. Cl. 299 (2014). A review of the billing records reveals that this matter was being investigated over a 19-month period prior to filing. *See* Motion for Fees, Ex. A at 1-2. The discrepancy between petitioner's recitation of the events following her vaccination and those contained in her medical records were irreconcilably at odds.

The Vaccine Injury Table states that SIRVA occurring within 48 hours of an influenza vaccination is considered a Table injury as long as the vaccinee meets certain criteria. *See* 42 C.F.R. § 100.3(a)(XIV)(B). The Qualifications and Aids to Interpretation require: "(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection; (ii) Pain occurs within the specified time-frame [of 48 hours]; (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and (iv) No other condition or abnormality is present that would explain the patient's symptoms." 42 C.F.R. § 100.3(c)(10)(i-iv). According to the contemporaneous medical records, petitioner did not meet any of the requirements for a Table SIRVA. She had a history of cervicalgia and right trapezius spasm which required trigger point injections; she did not have an onset of pain within 48 hours of vaccination; she had an initial onset of pain in both shoulders; and she had MRI findings reflecting rotator cuff tendinitis in both shoulders.[22]

Petitioners have prevailed in SIRVA claims where they have not met the Table criteria. In these situations, however, petitioner's claim was supported by an expert opinion and the presiding special master made a finding that onset of injury occurred within 48 hours of vaccination. *See, e.g., Forman-Franco v. Sec'y of Health & Human Servs.*, No. 15-1479V, 2019 WL 7602582 at *11 (Fed. Cl. Spec. Mstr. Dec. 19, 2019); *Goring v. Sec'y of Health & Human Servs.*, No. 16-1458V, 2019 WL 3938705, at *14-15 (Fed. Cl. Spec. Mstr. May 6, 2019). In the instant matter, petitioner did not provide any evidence of onset within 48 hours other than her affidavit. Reasonable basis requires a claim be "feasible," not a mere possibility that a claim might be feasible.

The billing records herein reflect an extensive pre-filing inquiry performed. The inconsistencies between the medical records and the facts as stated by petitioner should have been apparent and affect the feasibility of petitioner's claim as a result of, among other issues, the two-

---

[22] During the initial status conference on August 3, 2016, petitioner was ordered to file proof of vaccination. *See* Scheduling Order, ECF No. 12. While this matter was in SPU, then-Chief Special Master Dorsey issued a Fact Ruling determining that petitioner had proffered sufficient proof of vaccination despite being unable to obtain her vaccination record from her employer. *See* Order, ECF No. 29. Because it was decided that there was sufficient evidence to prove vaccination despite the lack of a vaccine record, that issue will not be belabored here.

month gap between petitioner's vaccination, her first documented complaint of right shoulder pain and her reports that her pain began one month and two weeks after her flu vaccination.

There was no corroborative evidence to support a causal relationship between petitioner's vaccination and her shoulder pain.

### III. Conclusion

In accordance with the foregoing, petitioner's motion for attorneys' fees and costs is **DENIED**. The Clerk of the Court is directed to enter judgment in accordance with this Decision.[23]

**IT IS SO ORDERED.**

<u>**s/ Mindy Michaels Roth**</u>
Mindy Michaels Roth
Special Master

---

[23] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by each party filing a notice renouncing the right to seek review.